2023 IL App (1st) 220825-U

SECOND DIVISION

September 26, 2023

No. 1-22-0825

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 16677 |
| | ) | |
| EDDIE CROWDER, | ) | Honorable |
| | ) | Vincent M. Gaughan, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE McBRIDE delivered the judgment of the court.
Justices Ellis and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Trial court's first-stage dismissal of defendant's postconviction petition affirmed where defendant failed to allege the gist of a constitutional claim of ineffective assistance of appellate counsel.

¶ 2    Following a jury trial, defendant Eddie Crowder was found guilty of first-degree murder

(720 ILCS 5/9-1(a)(1) (West 2016)) under the theory of transferred intent, and aggravated battery

(720 ILCS 5/12-3.05(a)(1) (West 2016)), and was sentenced to 20 years' imprisonment and 30

months' probation, respectively. In this appeal, defendant challenges the trial court's first-stage

dismissal of his postconviction petition, arguing that he set forth the gist of a constitutional claim of ineffective assistance of appellate counsel.

¶ 3    Much of the following facts are taken from the Rule 23 order which was filed in defendant's direct appeal (*People v. Crowder*, 2023 IL App (1st) 210642-U), and we repeat those facts, as well as other necessary facts from the record, as they are relevant to this appeal.

¶ 4    Defendant was charged by indictment with multiple offenses arising from the October 21, 2017, stabbings of Elizabeth Kennedy and Jonathan Williams, which resulted in Kennedy's death. The State proceeded on two counts of first-degree murder and one count of aggravated battery. Defendant's answer to discovery raised the affirmative defense of self-defense.

¶ 5    At trial, Jonathan testified that he was married to, and had children with, Dominique Catledge. Jonathan admitted that at the time of trial, he had a pending domestic battery case, as well as two prior cases involving Catledge from 2008 and 2017. Jonathan also had two children with Kennedy—Jennifer and Jonathan Jr. Jonathan testified that Kennedy and defendant were in a relationship at the time of the incident, and had a baby together. Jonathan had known defendant as a close family friend since childhood, and his children considered defendant to be an uncle. Jonathan testified that he did not have any issue with defendant having a child with Kennedy, but his son, Jonathan Jr., had previously confronted defendant about it.

¶ 6    On October 21, 2017, at approximately 5 p.m., Jonathan traveled with Catledge and their children to his father James's house to pick up Jennifer. James was not home, so they waited on the porch. Jonathan then saw Kennedy drop Jennifer off behind the house, and she joined them. Jonathan testified that he wanted to speak with defendant to "address the issue" so that his son would no longer have "clashes" with defendant.

¶ 7 Approximately 30 minutes after Kennedy arrived, James and defendant arrived in defendant's vehicle. Jonathan believed that James and defendant had been drinking. He described James as "a little wobbly." Defendant was also not "sober," and walked up with a beer in his hand. Jonathan shook defendant's hand and "calmly" asked him to speak with him. Defendant agreed. Jonathan told defendant that he knew defendant would "be around" because he was a friend of the family and had a child with Kennedy, so there was "no need" for them to fight. Jonathan informed defendant he wanted them to "come to a compromise." Jonathan testified that defendant became belligerent and said that he "didn't want to hear this s***." Kennedy then approached the pair, came between them, and said, "we're not going to do this right now." Jonathan told her that he did not intend to fight.

¶ 8 As Jonathan was speaking with Kennedy, defendant took "a cheap shot" by swinging his fist at him. Defendant missed, but bumped James and knocked him to the ground. As Jonathan moved to help James up, Jonathan observed that defendant was holding an unopened pocketknife. Jonathan knew that defendant carried a knife, and had observed defendant with knives before.

¶ 9 Defendant swung the knife at Jonathan, who swung back with his fists "in self-defense" and hit defendant on the right side of his face. Defendant then opened the knife, and Kennedy stepped forward to stop him while Jonathan stepped backward. Defendant swung the open knife once, missing Jonathan. Jonathan testified that defendant "touched" Kennedy with the knife, but Jonathan could not determine whether Kennedy had been stabbed.

¶ 10 Defendant then "came at" Jonathan with the open knife, and Jonathan threw his left hand over his face for protection. Defendant cut Jonathan's arm, and then sliced again, hitting the side of his face. Defendant continued to attack Jonathan with the knife, scratching his neck with less force than before. Jonathan attempted to flee toward James's house, and defendant stabbed him in

the back twice. Jonathan then ran to the gangway and grabbed a piece of fence to defend himself as defendant pursued. Jonathan heard screaming from the front sidewalk, but could not see what was happening. Jonathan saw defendant look toward the sidewalk, then fold the knife, and walk off.

¶ 11 At that point, Jonathan returned to the sidewalk and observed Kennedy on the ground in a puddle of blood. Jonathan identified photographs of the scene and marked the location of the fight, James's house, and the fence, as well as the slat of fencing that he used, which were admitted into evidence. Jonathan also identified photographs of his injuries, which were also admitted into evidence.

¶ 12 On cross-examination, Jonathan testified that his pending domestic battery case involved a different woman with whom he also had a child. Jonathan also explained that the incident between defendant and Jonathan Jr. had occurred approximately a month before the offense, just after Jonathan Jr. turned 16 years old. During that incident, Jonathan Jr. vandalized defendant's vehicle and asked defendant to leave, and Jonathan believed that defendant had "put his hands on" Jonathan Jr. Jonathan testified that he later learned that defendant and Jonathan Jr. had "patched things up" earlier on the day of offense, but defendant did not mention it at the time. Jonathan denied that he was angry about the earlier incident, reiterating that he did not want to "have a confrontation" with defendant, but rather desired to discuss the situation and come to a compromise. Jonathan further testified that he had not had "any words" with defendant about Kennedy's pregnancy, and that Jonathan was not bothered by it.

¶ 13 James testified that he and defendant were friends, and that they had known each other for approximately 11 years. On October 21, 2017, he was drinking alcohol with defendant before defendant drove him home. James testified that he was intoxicated, but not "out of it." There had

previously been an "issue" between defendant and Jonathan Jr., but they had since "made peace." Defendant, however, did not want to enter the house because Jonathan did not know that he and Jonathan Jr. had "ironed out th[eir] differences," and Jonathan would have been upset to see him.

¶ 14    At some point, James saw Jonathan approach defendant and tell him that he "didn't think it would be wise for him to be there" because Jonathan Jr. would arrive soon. As Jonathan and defendant argued, Kennedy became upset and attempted to stop them. James believed that he tripped and fell on an uneven sidewalk, and did not know what occurred next. He did not see anything happen to Kennedy. James identified photographs of the sidewalk covered in Kennedy's blood, himself and Kennedy on the ground.

¶ 15    James testified that when officers arrived, they informed him that he was bleeding and that he should go with the paramedics. James did not realize that he had an injury until that time. James identified a photograph of an injury to his wrist, acknowledging that the picture looked like his skin was "torn," but expressing that his injury was "not as bad as it looks."  James testified that he then went to the hospital where they "stitched it up."

¶ 16    Catledge testified that she was married to Jonathan, and that they had been together for 14 years. Catledge admitted that she filed police reports against Jonathan in 2007 and 2008 in which she alleged he had been physically violent with her. At the time of trial, Catledge had four biological children with Jonathan, including twins, Jaythan and Jabarri. Catledge had a "[p]retty good" relationship with Kennedy. Catledge explained that defendant and Kennedy had been in a relationship for around four years, although they first informed the family about their relationship approximately 11 months prior to the offense, when Kennedy discovered she was pregnant.

¶ 17    Catledge testified consistently with Jonathan regarding defendant's arrival at James's house. Catledge observed Jonathan approach defendant to speak with him, and then heard

defendant say in an angry tone of voice that he "wasn't trying to hear the s***" that Jonathan was saying. Catledge then saw defendant "thr[o]w a punch." Catledge and Kennedy were between the men when this happened, and Jennifer was also nearby. Catledge tried to move Kennedy and Jennifer out of the way. Catledge observed that James had been pushed to the ground, and Jonathan tried to help him. At that point, Catledge observed that Jonathan's arm was cut. Jonathan then said to Catledge that "he stuck her," but she did not realize what he meant at that point. Jonathan then ran toward James's house, and defendant followed.

¶ 18    Catledge held Kennedy, but let her go so that Catledge could run after the men. Kennedy then fell on the concrete and shattered her teeth. Jennifer began screaming that her mother was bleeding. Catledge saw defendant walk back toward the house, holding a black knife which he closed and placed on his belt. Catledge also observed that there was a cut on Jonathan's arm. Defendant began to walk toward his vehicle, and started to run once he became closer to Kennedy. Kennedy was pronounced dead when the ambulance arrived. Catledge further testified that she knew that defendant carried a knife, and that he had it whenever she saw him.

¶ 19    On cross-examination, Catledge testified that she had seen Jonathan upset many times before, and he was not upset on the day of the incident. Catledge did not see Kennedy or Jonathan being stabbed. She did not remember seeing either Jonathan or defendant land a punch on each other.

¶ 20    Jennifer testified that she was 15 years old at the time of trial, and that Jonathan is her father. On October 21, 2017, Jennifer's mother, Kennedy, drove her to James's house. Jennifer was sitting in the passenger's seat of Kennedy's car with the door open when defendant and James arrived. Jonathan walked to defendant to speak with him, and during their conversation they became louder and defendant swung at Jonathan. When trying to break up the fight, Jennifer,

Kennedy, and James fell to the ground. After standing, Jennifer observed blood coming from Kennedy's chest and covering her shirt. Defendant and Jonathan were still fighting, and defendant began chasing Jonathan with an open knife.

¶ 21 Catledge then held Kennedy, who fell forward onto the ground. Jennifer screamed and stayed with Kennedy until Jonathan returned and laid on the ground with them. Defendant went to his car, and Jennifer ran to a friend's house for help. On cross-examination, Jennifer testified that she was a few houses away when Kennedy was stabbed.

¶ 22 Jabarri testified that he was 12 years old at the time of trial. Catledge is his mother and Jonathan is his father. Jabarri testified consistently with Jonathan regarding everyone's arrival at James's house. Jabarri testified that defendant was holding a beer bottle when he approached and identified photographs of the bottle in court. Jabarri heard Jonathan ask to speak with defendant about a prior "situation" between defendant and Jonathan Jr., and defendant said that he did not want to talk. Jabarri was 5 to 10 feet away when defendant then started "pushing" Jonathan. Jabarri testified that Kennedy said that they should not be "do[ing] this right now," and moved to break up the fight. Jabarri observed defendant pull a knife from his right back pocket and begin swinging it toward Jonathan. Defendant cut Jonathan's arm and they moved toward the house, where Jonathan picked up a piece of a picket fence and threw it at defendant. Jabarri then saw defendant stab Kennedy, who was between defendant and Jonathan, although Jabarri did not believe that defendant stabbed her "on purpose." Jabarri then testified that he then saw Catledge holding Kennedy, and when Catledge let go, Kennedy fell to the ground hitting her jaw on the concrete. A lot of blood emerged from her chest and mouth, and her "teeth started to fall out." Jabarri saw defendant walk away, get into his car, and drive off. Jonathan returned and tried to stop Kennedy's bleeding. Jabarri then ran to a nearby school where he asked two people to call the police.

¶ 23    On cross-examination, Jabarri admitted that he had discussed the incident with his family before testifying.

¶ 24    Jaythan testified that he was 12 years old at the time of trial. Jaythan saw Jonathan try to speak to defendant, but defendant "was not feeling it" and walked away. Defendant became angry and pushed Jonathan, who pushed him back. They fought, and defendant drew a knife, swinging it at Jonathan multiple times and cutting his arm.  Kennedy was between the men, telling them not to fight. Jaythan testified that defendant switched the knife from one hand to another between swings, demonstrating for the jury. Defendant swung the knife at Jonathan but hit Kennedy in her upper chest. Kennedy fell to the ground and began bleeding out "very fast."

¶ 25    The prosecutor then asked Jaythan about James, Jaythan's grandfather, who Jaythan referred to as "PaPa":

> ASA: Let me direct you back to, now, closer to when we're talking about the stabbing motions as you had demonstrated. At some point was PaPa out there?
>
> JAYTHAN: Yes.
>
> ASA: Did you see anything happen to PaPa?
>
> JAYTHAN: Yes.
>
> ASA: What happened to PaPa?
>
> JAYTHAN: He was cut on his wrist, somewhere around his wrist. When [defendant] swung he stumbled and fell to the ground.

¶ 26    Jaythan also testified that he saw a bottle of "[l]iquor" in defendant's hands as defendant approached before the fight.

¶ 27    Dr. Khanh Huynh, an emergency room physician at Holy Cross Hospital, testified that he treated Jonathan on October 21, 2017. Jonathan had lacerations to the face, left forearm, and left

upper back, as well as abrasions to the right hand and head. Jonathan's facial stab wound required two sutures, and his back injury required four sutures. The wound to Jonathan's left forearm was a larger laceration categorized as a "complex laceration repair" due to its depth and size. Jonathan received a total of 33 sutures in the left forearm.

¶ 28    The State next called Dr. Kirsten Howell, an assistant medical examiner, who performed Kennedy's autopsy. Prior to her testimony, the following occurred outside the presence of the jury:

> DEFENSE COUNSEL: Judge, I have an objection. The medical examiner is next. We have gone through the photographs the State intends to show. People's Exhibit 33, an interior shot, I object to that. For the record, I think it's unnecessary for the jury to see. They can see the exterior stab wounds. To show them that interior portion I think would tend to inflame them.  I would object.
>
> THE COURT: [ASA]?
>
> ASA: Judge, the injuries to the aorta are a contributory factor to the death in this case. It is--
>
> THE COURT: What did the pathology [*sic*] say as to the cause of death?
>
> ASA: Multiple stab wounds, and the aorta was one. It was an artery of the body that was stabbed and injured contributing to the death in this case, so it is relevant.
>
> THE COURT: All right. It's—how many other wounds are you going to show, other than the wounds in the chest?
>
> ASA: One to the right hand.
>
> THE COURT: All right. So in this case the wound to the right hand is serious, but it would not in all likelihood cause death. But the wound to the aorta would. Usually these little cuts, they will say everything contributed. Primary cause of

death is the puncture of the aorta. Under these circumstances, I find it is not unduly gruesome and is more probative than unduly prejudicial. Over the defense objection that will be admitted."

¶ 29    Dr. Howell testified that she performed Kennedy's autopsy on October 22, 2017. Kennedy had a stab wound on her chest, an incise wound on her right arm, and an injury to her aorta. The cause of death was homicide due to multiple sharp force injuries. Dr. Howell viewed People's Exhibits 30-33 and testified that those photographs were a "clear and accurate depiction" of the autopsy she conducted on Kennedy. The court acknowledged the defense's objection to one of the photos, and then admitted them over the objection. The photos were published for the jury. Dr. Howell identified People's Exhibit 30 as a photograph of "an incised wound" on Kennedy's right wrist. Dr. Howell testified that the wound was classified as "a sharp force injury," and that it was "caused by a sharp instrument." The wound "went through the skin and underlying soft tissue for a depth of approximately one fourth inch." Dr. Howell identified People's Exhibit 31 as a photograph of a "sharp force" stab wound to Kennedy's chest. Dr. Howell explained that it was only discovered to be a stab wound upon an internal examination of the body, as it was "deeper than it is long or wide." Dr. Howell testified that the stab wound punctured Kennedy's "skin, underlying soft tissue, through the second rib on the right, through the pericardium, which is a sac around the heart, and into the aorta coming off of the heart." Dr. Howell identified People's Exhibit 32 as a "closer review" of People's Exhibit 31 and testified that the photograph showed "some of the subcutaneous fat or breast tissue that's immediately under the edge of the wound and also under the skin."

¶ 30    The prosecutor then stated, "Doctor, I'm going to show you an internal photograph of the aorta and pericardial sac that you mentioned," showing the doctor People's Exhibit 33. Dr. Howell

was asked to explain what was depicted in the photograph, and the doctor identified Kennedy's heart, "the pericardium or the sac around the heart," which she explained was opened by the hospital medical team "before she came to me." Dr. Howell testified that the photograph also showed a two-centimeter incision in the heart, and "some suture material" that was used to close the injury to the aorta. Dr. Howell explained that the aorta is "the major blood vessel coming" from the heart, and that it "carries the blood for the entire rest of the body." When asked to "explain the significance of the damage done" to Kennedy's aorta, Dr. Howell pointed out that the two-centimeter hole in Kennedy's aorta from the stab wound would have caused blood to leak into Kennedy's chest cavity, placing pressure on her lungs, and preventing the lungs from expanding and contracting normally.

¶ 31 The State rested.

¶ 32 Chicago police officer Douglas Anderson testified that he and his partner responded to the scene and later arrested defendant at his home. They searched him and recovered a clean black pocketknife from his pocket, which Anderson identified in court. Anderson did not notice injuries on defendant's face and hands. Anderson identified photographs of defendant's hands taken when he was arrested, which were admitted into evidence. Those photographs are included in the record and do not depict any visible injuries.

¶ 33 The parties entered a stipulation that Detective Kristy Battalini would testify that she interviewed Jabarri and Jaythan and memorialized the interview. Neither the notes, nor a subsequent report, contained a statement about defendant approaching the gathering with a beer bottle in his hands.

¶ 34 Defendant testified that he had been a Marine between 1986 and 1993 and was honorably discharged. As part of his training, defendant learned to fight with a bayonet, but not a pocketknife.

On October 21, 2017, defendant had been at his cousin's house with James, talking and drinking. Defendant then drove James home, where he saw Jonathan, Kennedy, Jennifer, and Catledge. Defendant previously had a dispute with Jonathan Jr., who had called Kennedy a name when defendant's son was born, but the two had resolved their differences. Defendant also testified that he was aware that Jonathan had prior "domestic situations" and "problems with violence."

¶ 35    Jonathan approached defendant and asked him "why the f*** [he was] threatening [him]." Defendant put his hand out to shake Jonathan's hand, and Jonathan "gripped [his] hand hard." Defendant testified that he said "f*** that," and informed Jonathan that he and Jonathan Jr. had already "squashed" their issues. Jonathan then grabbed defendant by his right bicep and hit defendant across the face, knocking off his glasses. At that point, Kennedy came between the men. Jonathan again swung at defendant. Defendant believed that he needed to defend himself, because Jonathan was taller, younger, "hot-headed," and put defendant in fear for his life. Defendant denied that he was threatening Jonathan, or that he had an issue with Jonathan.

¶ 36    Defendant testified that Jonathan began "coming at" defendant, and so defendant moved Kennedy out of the way, removed a knife from his "right hip," and swung at Jonathan. Defendant did not hit Jonathan, but he did not see where the knife went at the time because his attention was on Jonathan and he feared for his life. Jonathan then "c[a]me[ ] at" defendant again, so defendant hit him in his left forearm. Defendant saw Kennedy fall to the ground, and noticed that she was bleeding profusely. At that point, Jonathan ran and defendant pursued him. Jonathan threw a chair at defendant, and defendant turned around, walked away, got in his car and drove home. Defendant testified that he went into shock, panicked, and attempted to dial 911. Defendant drove home and attempted suicide, but did not go through with it because he was thinking of his children. He then changed clothes, intending to go to the hospital and police department, but police approached him

on his way to his vehicle. Defendant denied that he stabbed Jonathan in the back and the face, or that he saw Jonathan fall against a tree.

¶ 37    On cross-examination, defendant testified he was 5'8" and weighed 180 pounds. He acknowledged that, when Jonathan ran toward the house, defendant did not stay with Kennedy, but rather, "chased" him. Defendant also admitted that he informed the police that he did not know why he did not walk away when Jonathan hit him, and that if defendant "swung more, it was just out [of] rage."

¶ 38    On redirect examination, defendant testified the incident was not a calm situation, and that other people were attempting to break up the fight between him and Jonathan. Defendant did not walk away from the fight because Jonathan "[k]ept coming." On re-cross examination, defendant testified that Jonathan ran to the house when defendant stabbed him, and defendant ran after him.

¶ 39    In rebuttal, the parties entered a stipulation that Detective Battalini would testify that during her interview of defendant, he did not say that he moved Kennedy out of the way or that Jonathan had hit him across the face and knocked his glasses to the ground.

¶ 40    In closing, the prosecution argued that defendant was the initial aggressor, and when Jonathan attempted to talk to defendant about the issue with Jonathan Jr., defendant "got mad" and began pushing and punching. The prosecutor argued:

> "Everyone is there breaking it up and protecting both of them, both James and the defendant, [saying] 'Stop it' but the defendant didn't stop. When Jonathan dared to talk to [Kennedy] and said 'Let me talk to this man,' the defendant took a cheap shot. He took a swing at Jonathan and missed. At that point the fight kept going. Right now there's pushing. Now there's punching going back-and-forth and Jonathan lands one on the defendant's face and that's it."

¶ 41    The prosecutor argued that defendant "erupt[ed] *** in a fit of rage," removed his knife, and turned "this fist fight to a deadly fight for survival." The prosecutor argued that defendant never feared for his life, and that the force defendant used was "not justified."

¶ 42    Defense counsel, however, asked the jury to find defendant not guilty of first-degree murder based on self-defense. Defense counsel argued that it was Jonathan who "really started this," that he was a "bully" with "a short fuse," and that his family was afraid of him. Defense counsel contended that defendant's testimony that "Jonathan threw the first punch" was "rational and believable based on [Jonathan's] history of violence." Counsel argued that defendant acted in self-defense, and that defendant "used reasonable force in defending himself against someone he knew to be a violent individual."

¶ 43    In rebuttal, the prosecutor began to explain the law of self-defense, stating,

"[A]s my partner explained the law, you could use proportional force with somebody. If somebody is squaring up with you, guess what? You can square up with them. If somebody on the street pulls a gun on you, guess what? Hopefully, you have all your appropriate paperwork and you pull a gun on them. That's how it works."

¶ 44    Defense counsel objected, and the following side bar took place outside the jury's presence:

THE COURT: What is your objection?

DEFENSE COUNSEL: My objection is that that's not true. If someone comes at you with a fist, there's nothing that says you could only hit them with fists. If you're in fear of death and great bodily harm, you could use whatever force is necessary. Period. * * * I just don't want the jury having the impression that under any circumstance you could fight. If it's fists, it's only fists. If it's guns, it's only guns.

If it's a machete, it's only a machete. It's the perception of what's happened. That is the law.

ASA: There is a jury instruction on this and he's asking the jury to find – asking to find straight not guilty of first-degree murder. There's that instruction as to two parts.

THE COURT: Where[ ] in that instruction does it lay out to have someone use fists you could only use fists?

ASA: No. Proportionate. I'm making argument.

THE COURT: No. For this you're saying it could only be that reaction. The argument could be the concept. The other thing, people can be not guilty of first-degree murder, the weapon – I'll just – [The ASA] is going to re-initiate her –

ASA: Give me that instruction or read me that instruction.

THE COURT: You're not getting away with this. It does not say you could only use fists if somebody uses a fist on you. Stay away from that. Thank you very much.

¶ 45  After the jury reentered the courtroom, the court informed the jury:

"Ladies and gentlemen, there has been an objection and I just want to clarify one point. It has to depend on the facts and the situation and you, as a jury, deliberating with your brother and sister jurors will decide what the facts are in this case and then you apply the facts to the law and in that way arrive at your decision.

There was a statement that if someone uses fists you can use fists. That is not the law. If someone uses a gun you could only use the gun, that is not the law. Completely disregard that and then [the ASA] will re-initiate her closing argument."

¶ 46    Upon re-initiation of closing argument, the prosecutor read the self-defense instructions to the jury and urged them to use "reasoning and common sense" in deciding whether defendant acted in self-defense, noting in particular that defendant admitted that he "never saw a weapon in Jonathan's hands."

¶ 47    The prosecutor then argued that James's testimony that he fell on the sidewalk and scraped his arm was not believable. The prosecutor stated, "Come on, folks. You've all fallen on the sidewalk at some point in your life. Tell me who's all needed stitches? Okay? He got slashed, too." Defense counsel objected to the prosecutor's remark, stating that James did not testify to that, and the prosecutor responded, "Argument." The court then admonished the jury, "Ladies and gentlemen, it still has to be based on evidence. You've heard the testimony and you've also heard my instruction. Anything that conflicts with your individual recollection of the evidence should be disregarded. State, go ahead." The prosecutor continued, "How about the evidence of one of the twins? I can't remember, ladies and gentlemen. You have to rely on your memory but one of the twins said I saw my grandpa get slashed. How about that evidence?" The prosecutor also noted that defendant acknowledged to police that he was in a fit of "rage" during the altercation.

¶ 48    The jury found defendant guilty of first degree murder and aggravated battery. Defendant filed a motion for a new trial, arguing in part that the jury erred in finding him guilty of first degree rather than second degree murder because the evidence showed he feared Jonathan and believed he was acting in self-defense. The court denied the motion and imposed 20 years' imprisonment for first degree murder and 30 months' probation to be terminated *instanter* on the aggravated battery charge. The court denied defendant's motion to reconsider the sentence.

¶ 49    On appeal, defendant challenged the sufficiency of the evidence to support his first degree murder conviction. He contended that his conviction should have been reduced to second degree

murder, arguing that the evidence showed that he acted with a subjective belief in the necessity of self-defense. This court affirmed, concluding that, when viewing the evidence in the light most favorable to the State, a rational trier of fact could have found defendant did not establish that he was acting under an unreasonable belief in self-defense when he stabbed Jonathan and Kennedy.

¶ 50 Thereafter, on February 8, 2022, defendant filed a *pro se* petition for postconviction relief. In that petition, defendant alleged, among other things, that the circuit court abused its discretion when it allowed the autopsy photo of Kennedy's punctured aorta to be published to the jury and permitted to "go to the jury room during deliberation[s]." Defendant next argued that he was denied a fair trial because the prosecutor "misstated the law of self-defense" and "injected personal facts that were not in evidence" during closing arguments. Defendant specifically contended that there was no evidence to support the prosecutor's statement that defendant had taken a "cheap shot" at Jonathan when Jonathan and Kennedy were speaking. Defendant maintained that this misstatement gave the jury the impression that defendant attacked Johnathan "out of a jealous rage," and "intimated to the jury that the defendant was the aggressor." Defendant also contended that the prosecutor misstated the evidence in saying that one of the twins "said I saw my grandpa get slashed." Finally, defendant argued that appellate counsel was ineffective for failing to pursue the above issues on direct appeal.

¶ 51 On April 28, 2022, the circuit court summarily dismissed defendant's petition as frivolous and patently without merit. Regarding defendant's first claim, the trial court explained,

> "The medical examiner at [defendant]'s trial. Dr. Kirsten Howell, testified at trial she performed the victim's autopsy and described the victim's injuries including the cause and manner of death. She also identified such injuries via photograph and explained to the jury the extent of the injuries. It was rational to conclude providing

the jury with such photos during deliberations would have aided them in their understanding of the medical testimony." Accordingly, the court found that it was not error to admit the photo and allow it to go back with the jury during deliberations.

¶ 52    Regarding defendant's claim that the prosecutor misstated the law of self-defense during closing arguments, the court noted that it had sustained counsel's objection and "informed the jury to disregard the State's misstatement on self-defense as it was not an accurate statement of law." Accordingly, the court concluded that defendant had not suffered any prejudice from the error because "it was immediately corrected by both defense counsel and the trial judge."

¶ 53    The court then turned to defendant's claim that the prosecutor had misstated the evidence during closing argument. The court noted defendant's claim that the prosecutor improperly argued that defendant had taken a "cheap shot" at Jonathan, but concluded that, even if the statement was not based on the evidence, defendant had suffered no prejudice. The court explained that defendant's claim was based on an erroneous belief that the statement "solely led the jury to believe he was the initial aggressor." The court, however, found it "unbelievable" that the "one statement alone would have led the jury to believe defendant was the initial aggressor, when copious amounts of trial evidence," including testimony from Jonathan, Dominique, Jennifer, Jabarri, and Jaythan, indicated that defendant "was the initial aggressor during the altercation."

¶ 54    Finally, regarding defendant's claim of ineffective assistance of appellate counsel, the court explained that it had found the above claims frivolous and patently without merit, and accordingly, appellate counsel could not have been ineffective for failing to raise them.

¶ 55    In this court, defendant contends that the trial court erred in summarily dismissing his post-conviction petition. Defendant asserts that he sufficiently stated the gist of an ineffective assistance

of appellate counsel claim for counsel's failure to raise issues regarding the autopsy photo and the State's "repeated misstatements of the evidence during closing arguments."

¶ 56    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et. seq.* (West 2018)) provides a three-step process by which a convicted defendant may assert a substantial denial of his or her constitutional rights in the proceedings that led to the conviction. *People v. Edwards*, 2012 IL 111711, ¶ 21; *People v. Tate*, 2012 IL 112214, ¶ 8; see also *People v. Walker*, 2015 IL App (1st) 130530, ¶ 11 (citing *People v. Harris*, 224 Ill. 2d 115, 124 (2007)).

¶ 57    At the first stage of postconviction proceedings, the circuit court is tasked with independently reviewing the petition, and taking the allegations as true, determining whether " 'the petition is frivolous or is patently without merit.' " *People v. Hodges*, 234 Ill. 2d 1, 10 (2009) (quoting 725 ILCS 5/122–2.1(a)(2) (West 2006)); see also *Tate*, 2012 IL 112214, ¶ 9. At this stage, the court may not engage in any factual determinations or credibility findings. See *People v. Plummer*, 344 Ill. App. 3d 1016, 1020 (2003); see also *People v. Coleman*, 183 Ill. 2d 366, 380-81 (1998). Instead, the court may summarily dismiss the petition only if it finds the petition to be frivolous or patently without merit. See *People v. Ross*, 2015 IL App (1st) 120089, ¶ 30; see also *Hodges*, 234 Ill. 2d at 10. A petition is frivolous or patently without merit if it has no arguable basis either in law or in fact. *Tate*, 2012 IL 112214, ¶ 9. Our supreme court has explained that a petition lacks an arguable basis where it "is based on an indisputably meritless legal theory or a fanciful factual allegation"—in other words, an allegation that is "fantastic or delusional," or is "completely contradicted by the record." *Hodges*, 234 Ill. 2d at 11-12; *People v. Brown*, 236 Ill. 2d 175, 185 (2010); see also *Ross*, 2015 IL App (1st) 120089, ¶ 31. Our review of summary dismissal is *de novo. Tate*, 2012 IL 112214, ¶ 10.

¶ 58    Claims of ineffectiveness of both trial and appellate counsel are governed by the two-prong standard set forth in *Strickland v. Washington,* 466 U.S. 668, 687 (1984). Under this standard, the petitioner must demonstrate that counsel's performance was deficient and that such deficient performance substantially prejudiced him. *Id.* At the first stage of postconviction proceedings, a petition alleging ineffective assistance of appellate counsel may not be summarily dismissed if (1) it is arguable that appellate counsel's performance fell below an objective standard of reasonableness and (2) it is arguable that the petitioner was prejudiced. *Tate*, 2012 IL 112214, ¶ 19. "To adequately plead a claim of ineffective assistance of counsel, the petition must satisfy both prongs of the test." *People v. Bush*, 2022 IL App (1st) 210509, ¶ 31. Failure to meet either prong is fatal to the claim. *Id.* "Appellate counsel is not required to brief every conceivable issue on appeal, however, and it is not incompetence for counsel to refrain from raising issues that counsel believes are without merit." *Edwards*, 195 Ill. 2d at 163-64. Unless the underlying issue has merit, a defendant suffers no prejudice as the result of appellate counsel's failure to raise an issue on appeal. *People v. Rogers,* 197 Ill. 2d 216, 223 (2001); *People v. Easley*, 192 Ill. 2d 307, 329 (2000).

¶ 59    As an initial matter, we note that the State contends that defendant cannot make an arguable showing of ineffective assistance of appellate counsel for failure to raise appellate issues regarding the autopsy photo or the State's closing argument because those issues were not properly preserved for appeal. The State points out that, while trial counsel objected to the admission of the photo and to one of the alleged misstatements during closing argument, counsel did not raise the issues in the post-trial motion. Accordingly, appellate counsel could have only requested review of the issue under plain error, which the State contends would not have been meritorious. Defendant, however, asserts that appellate counsel was ineffective for failing to request plain error review on direct appeal, arguing that such review would have proven successful because the

evidence was "closely balanced." We conclude that we need not decide whether the issues were forfeited or whether plain error review would apply, because defendant's claims ultimately fail on the merits.

¶ 60    Defendant first contends that appellate counsel was ineffective for failing to argue on appeal that the trial court erred in allowing the jury to view People's Exhibit 33, what defendant characterizes as a "gruesome autopsy photo." Defendant contends that the photo, which depicts an internal view of the stab wound puncturing Kennedy's aorta, was "unnecessary" and "prejudicial."

¶ 61    In general, "[p]hotographs of a decedent may be admitted to prove the nature and extent of injuries and the force needed to inflict them, the position, condition and location of the body, the manner and cause of death, to corroborate a defendant's confession, and to aid in understanding the testimony of a pathologist or other witness." *People v. Richardson,* 401 Ill. App. 3d 45, 52 (2010). Where they are relevant to prove facts at issue, photographs are admissible unless they are so prejudicial and likely to inflame the jury that their probative value is outweighed. *Id.* "Even gruesome or disgusting photographs may be properly admitted into evidence if they are relevant to establish any fact at issue in the case." *People v. Armstrong,* 183 Ill. 2d 130, 147 (1998). "If photographs could aid the jury in understanding testimony, they may be admitted even if cumulative of that testimony." *People v. Chapman*, 194 Ill. 2d 186, 220 (2000). The determination of whether a jury should be able to see photographs of a decedent rests within the discretion of the trial court (*id*. at 219), and the decision to admit such photographs will not be overturned on appeal absent an abuse of discretion. (*People v. Bounds,* 171 Ill. 2d 1, 47 (1995)). Abuse of discretion is a "highly deferential standard of review," and a reviewing court will find an abuse of discretion only when the trial court's decision is "arbitrary, fanciful, or unreasonable to the degree that no

reasonable person would agree with it." *People v. Lerma*, 2016 IL 118496, ¶ 32 (internal quotations and citation omitted).

¶ 62    Defendant argues that the photo should not have been admitted because the cause of Kennedy's death—"multiple sharp force injuries"—was not in dispute. However, even if defendant did not challenge the exact cause of death, the nature and circumstances of Kennedy's death were in very much in dispute where defendant was claiming that he was acting in self-defense. In these circumstances, photographs of Kennedy's injuries, including the internal injury to her aorta, were relevant to allowing the jury to assess the nature and circumstances of her death.

¶ 63    Moreover, our supreme court has explicitly stated that "[w]hen a defendant in a murder trial pleads not guilty, the prosecution is allowed to prove every element of the crime charged and every relevant fact." *Chapman,* 194 Ill. 2d at 219-20. To sustain defendant's first-degree murder conviction, the State was required to prove, among other things, that he performed an act that caused Kennedy's death. See 720 ILCS 5/9–1(a) (West 2016). Accordingly, the State was permitted to present evidence relating to whether defendant's actions caused Kennedy's death. See *People v. Starks,* 287 Ill. App. 3d 1035, 1042 (1997) ("Regardless of the fact that defendant did not dispute the cause of death or the force used, the People may still prove every element and relevant fact of the offense charged, and if autopsy photos are relevant to establish any such fact, they are admissible despite their gruesome nature."). People's Exhibit 33, the photograph depicting the internal injuries to Kennedy's aorta, were probative of the nature and cause of her death, and corroborated Dr. Howell's testimony regarding Kennedy's internal injuries—that Kennedy had a two-centimeter hole in her aorta caused by a stab wound which allowed blood to leak into Kennedy's chest cavity, placing pressure on her lungs, and preventing them from expanding and contracting normally. These provided valid bases for admitting the photograph.

¶ 64    In so holding, we find *Richardson*, 401 Ill. App. 3d 45, instructive. In *Richardson*, the defendant was convicted of first-degree murder of his 11-month-old daughter. On appeal, the defendant challenged the admission of "27 gruesome autopsy photographs [which] were published to the jury via an overhead projector during the testimony of the medical examiner and then sent to the jury room during deliberations." Those photographs showed the infant victim's internal organs while she was being autopsied. This court acknowledged that the photos were "graphic," but found that "they were relevant to show the location and extent of the injuries, as well as their character and depth," and they were relevant to illustrate the medical examiner's testimony. *Id*.; see also *People v. Anderson*, 237 Ill. App. 3d 621, 631 (1992) ("autopsy photographs were properly admitted because they aided the jurors' understanding of the testimony of the pathologist *** with regard to the type of wounds, the type of instrument  used to cause them, the extent of the injuries, and the amount of force applied"); *People v. Forcum*, 344 Ill. App. 3d 427 (2003) (photographs were admissible and "relevant to establish the nature and extent of [the victim's] injuries and the manner in which the injuries had been inflicted, to corroborate the testimony of the officers and crime scene technicians who had found [the victim] and described the crime scene, and to help the jurors understand the testimony of the pathologist who had performed the autopsy).

¶ 65    Defendant, however, points to *People v. Lefler*, 38 Ill. 2d 216 (1967) and *People v. Landry*, 54 Ill. App. 3d 159 (1977), as support for his proposition that the autopsy photo should not have been admitted. In *Lefler*, 38 Ill. 2d at 222, our supreme court concluded that the trial court abused its discretion in allowing the jury to view autopsy photographs, finding "that the pictures had little probative value in view of the detailed testimony by the physician and the fact that the nature and extent of the injuries was not disputed." In *Landry*, 54 Ill. App. 3d at 162, the appellate court concluded that the trial court abused its discretion in allowing the jury to view autopsy photographs

finding the prejudice from their admission outweighed the probative value where the nature and circumstances of the victim's death was not truly in question. We note, however, that since *Lefler* and *Landry*, the supreme court has reemphasized the general rule that photographs of a decedent are admissible to prove, among other things, the nature and extent of the injuries, the manner and cause of death, or to aid in understanding the testimony of a pathologist or other witness. See *People v. Heard*, 187 Ill. 2d 36, 77-78 (1999) (autopsy photos, including a photo showing a victim's uterus being held open to show the six- to eight-week-old fetus, were properly admitted as they were relevant to the manner of the victims' deaths, they related to the State's theory of the case, and they "served the proper purpose of aiding the jury in its understanding of the medical examiner's testimony about the manner of the victims' deaths."); *Chapman*, 194 Ill. 2d at 220 (autopsy and crime scene photos, including photos of the victims' decomposing bodies, were properly admitted where they "assist[ed] the State in proving the position, condition, and location of the victims' bodies *** [and] served to aid the jury's understanding of the testimony of the pathologist and the crime scene investigators."). And, as discussed above, in contrast to *Lefler* and *Landry*, the nature and circumstances of Kennedy's death were in dispute here. Accordingly, we find no basis to conclude that the trial court erred in allowing the State to publish People's Exhibit No. 33 to the jury.

¶ 66    Defendant next contends that he sufficiently raised an arguable claim of ineffective assistance of appellate counsel for failure to argue on direct appeal that defendant was denied a fair trial due to the State's misstatements of the evidence and the law during closing arguments. Specifically, defendant contends that the State misstated the testimony of Jonathan and the twins, Jabari and Jaythan, in its closing arguments, and that the State misstated the law of self-defense.

¶ 67    "In closing argument, the prosecution may base its argument on the evidence presented or reasonable inferences therefrom, respond to comments by defense counsel which clearly invite or provoke response, denounce the activities of defendant and highlight inconsistencies in defendant's argument." *People v. Graca,* 220 Ill. App. 3d 214, 221 (1991). A "misstatement of the law during closing argument does not normally constitute reversible error if the circuit court properly instructs the jury on the law, as counsel's arguments are construed to carry less weight with the jury than do instructions from the circuit court." *People v. Buckley*, 282 Ill. App. 3d 81, 89-90 (1996) citing *People v. Lawler*, 142 Ill. 2d 548, 564-65 (1991). In addition, reviewing courts must presume, absent a showing to the contrary, that the jury followed the trial judge's instructions in reaching a verdict. *People v. Simms*, 192 Ill. 2d 348, 373, (2000).

¶ 68    In reviewing whether comments made during closing argument are proper, the closing argument must be viewed in its entirety, and the remarks must be viewed in context. *People v. Moody,* 2016 IL App (1st) 130071, ¶ 60. Finally, even if the prosecutor's closing remarks are improper, "they do not constitute reversible error unless they result in substantial prejudice to the defendant such that absent those remarks the verdict would have been different." *People v. Hudson*, 157 Ill. 2d 401, 441 (1993). Reversible error occurs only if defendant demonstrates that (1) the remarks were improper and (2) they were "so prejudicial that real justice was denied or the verdict resulted from the error." *People v. Jackson*, 2020 IL 124112, ¶ 83 citing *People v. Runge*, 234 Ill. 2d 68, 142 (2009).

¶ 69    First, defendant claims the prosecutor misstated the evidence when, in closing argument, the prosecutor made the following statement: "When Jonathan dared to talk to [Kennedy] and said 'Let me talk to this man,' the defendant took a cheap shot." Defendant contends that Jonathan "never testified that he made *** that statement." Jonathan, however, testified on cross-

examination that he "turned to face [Kennedy]" and said " 'I didn't come here to fight him. I came to talk to him like a man and handle this, comprise [*sic*] and get it over with.' " Jonathan then explained that while talking to Kennedy, defendant "took a cheap shot at me." The prosecutor's statement above is a reasonable paraphrasing of the above testimony.

¶ 70    Next, defendant claims that the prosecution misstated the evidence when, in closing argument, the prosecutor argued that James did not hurt his arm tripping on the sidewalk but that instead, he "got slashed." Specifically, defendant takes issue with the following statement:

> "Now, this is a man who says I think I fell on the sidewalk and I think I scraped my arm. Come on, folks. You've all fallen on the sidewalk at some point in your life. Tell me who's all needed stitches? Okay? He got slashed, too. *** You have to rely on your memory but one of the twins [Jabari and Jaythan] said I saw my grandpa get slashed. How about that evidence?"

Defendant contends that there was no evidence that defendant stabbed or slashed James, that "James testified that he tripped on [an] uneven sidewalk and fell to the ground," and that neither twin testified that he "saw [his] grandpa get slashed."

¶ 71    The record shows that during James's testimony, he identified a photograph of his injury. Although James testified that he tripped on an uneven sidewalk, he was asked whether it was "fair to say" that he did not actually know how he got the injury. James responded that he did not even notice the injury until the officers arrived and told him that he was bleeding and that he should go with the paramedics. James testified that he then went to the hospital where they "stitched it up."

¶ 72    During Jaythan's testimony, the following colloquy occurred:

> ASA: Let me direct you back to, now, closer to when we're talking about the stabbing motions as you had demonstrated. At some point was PaPa out there?

JAYTHAN: Yes.

ASA: Did you see anything happen to PaPa?

JAYTHAN: Yes.

ASA: What happened to PaPa?

JAYTHAN: He was cut on his wrist, somewhere around his wrist. When [defendant] swung he stumbled and fell to the ground.

¶ 73   Although not explicitly clear, Jaythan's testimony appears to indicate that James was cut on his wrist in connection with the "stabbing motions," and defendant's swinging. Based on the above testimony from James and Jaythan, the photograph of the injury, and the fact the injury required stiches, the prosecutor made a reasonable argument based on the evidence that James's injury was more consistent with having been cut during the altercation than having fallen on the sidewalk.

¶ 74   Additionally, even if any of the prosecutor's comments could be construed as misstatements regarding Jonathan's statement or James's injury, such misstatements would not amount to reversible error. In this appeal, defendant does not identify any particular prejudice suffered as a result of the alleged misstatements, contending only that the "cumulative impact" of the statements denied him a fair trial. However, defendant was not on trial for stabbing James, and whether James was also injured by defendant in the altercation, or the exact words Jonathan used when he attempted to diffuse the situation, would have little to no bearing on defendant's conviction for murdering Kennedy. In these circumstances, there can be no real argument that any of the alleged misstatements were "so prejudicial that real justice was denied or the verdict resulted from the error." *Jackson*, 2020 IL 124112, ¶ 83 citing *Runge*, 234 Ill. 2d 68, 142 (2009).

¶ 75    Finally, defendant argues that the prosecutor misstated the law of self-defense when in rebuttal, the prosecutor remarked,

> "as my partner explained the law, you could use proportional force with somebody. If somebody is squaring up with you, guess what? You square with them. If somebody on the street pulls a gun on you, guess what? Hopefully, you have all your appropriate paperwork and you pull a gun on them. That's how it works."

¶ 76    The record shows, however, that defense counsel immediately objected to the prosecutor's explanation. The trial court sustained defense counsel's objection and informed the jury to disregard the prosecutor's statement—that it was not an accurate statement on the law of self-defense. The court then went on to properly instruct the jury on the elements of first- and second-degree murder, as well as self-defense. The court also properly instructed the jury that closing statements are not evidence, and that "any statement or argument made by the attorneys which is not based on the evidence should be disregarded." In these circumstances, we find no arguable claim that the prosecutor's comment could have constituted reversible error. *Buckley*, 282 Ill. App. 3d at 89-90. Accordingly, appellate counsel was not ineffective for failing to raise the issue on appeal. *Rogers,* 197 Ill. 2d at 223; *Easley*, 192 Ill. 2d at 329.

¶ 77    Having concluded that there is no arguable merit to defendant's claims that the trial court erred in allowing the jury to view People's Exhibit 33 or that he was denied a fair trial due to the State's statements during closing arguments, defendant has not shown that he was arguably prejudiced by appellate counsel's failure to raise either issue on appeal.

¶ 78    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 79    Affirmed.